UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | |
| | : | **VIOLATION:** |
| **ING BANK, N.V.** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy to Violate TWEA** |
| **Defendant.** | : | **and IEEPA)** |

## INFORMATION

The United States informs the Court that:

### GENERAL ALLEGATIONS

At all times material to this Information:

1. Defendant ING Bank, N.V. ("ING Bank") is a financial institution registered and organized under the laws of the Netherlands.

2. Defendant ING Bank had branches throughout the world and conducted financial transactions in United States Dollars at and through unaffiliated U.S. financial institutions in New York and elsewhere.

3. From on or about the early 1990s until 2007, Defendant ING facilitated United States Dollar transactions for a number of co-conspirators, both known and unknown to the United States. For the most part, these co-conspirators consisted of primarily banks and customers in Cuba and Iran.

4. Over the years, the United States has employed sanctions and embargos with regard to countries, such as Cuba and Iran. Those restrictions arose in response to repeated support by those nations for international terror against the United States and its allies, and with regard to Iran the proliferation of weapons of mass destruction.

1

5. From on or about the early 1990s until 2007, financial transactions conducted by wire on behalf of Cuban or Iranian financial institutions and customers were subject to sanctions by the United States.

6. The United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, among other things, administers and enforces economic and trade sanctions against certain foreign countries and entities associated with those countries.

7. With regard to financial transactions involving Cuba and Iran, OFAC is responsible for administering regulations against those countries and entities and was at all times applicable here empowered to authorize transactions with these countries and entities through the granting of authorization, in the form of a license.

The Trading with the Enemy Act & Cuban Asset Control Regulations

8. Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations. These laws, which prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses and Cuban assets, were promulgated under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. app. §§ 1-44, and are generally administered by OFAC.

9. Unless authorized by OFAC, the Cuban Assets Control Regulations ("CACRs") prohibit persons subject to the jurisdiction of the United States from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, including all "transfers of credit and all payments" and "transactions in foreign exchange." 31 C.F.R. § 515.201(a). Furthermore, unless authorized by OFAC, persons

subject to the jurisdiction of the United States are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b). The CACRs also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations. 31 C.F.R. § 515.201(c). The CACRs were in effect at all times relevant to the Information.

The International Emergency Economic Powers Act & Iranian Transaction Regulations

10. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

11. In Executive Order 12957, issued on March 15, 1995, the President found that "the actions and policies of the Government of Iran constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and ...declare[d] a national emergency to deal with that threat."

12.     On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran. These sanctions prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or by a United States person, wherever located. This prohibition includes the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or reexportation , directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, the President issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

13.     With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the Information.

## COUNT ONE
## CONSPIRACY TO VIOLATE TWEA AND IEEPA
## (18 U.S.C. § 371)

14. Paragraphs 1 through 13 of the General Allegations are hereby re-alleged as if fully set forth herein.

15. From in or about the early 1990s and continuing until 2007, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, Defendant ING Bank, did willfully and knowingly conspire, confederate and agree with persons, both known and unknown to the United States to commit offenses against the United States, that is:

(a) to violate TWEA, Title 50, United States Code, Appendix Sections 1-44, and regulations promulgated thereunder, principally 31 C.F.R. § 515.201, which prohibits U.S. persons from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, and 31. C.F.R. § 515.201(c), which prohibits attempts to evade or avoid the restrictions contained in the CACRs; and

(b) to violate IEEPA, specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the ITRs, principally 31 C.F.R. § 560.204, which prohibits the exportation of services from the United States to Iran, and 31 C.F.R. § 560.203, which prohibits attempts to evade or avoid the restrictions contained in the ITRs.

## PURPOSES OF THE CONSPIRACY

16. A purpose of the conspiracy was for the defendant and the co-conspirators to profit financially by undertaking through the United States a variety of financial transactions on behalf of financial institutions and customers located in countries sanctioned by the United States.

17. A further purpose of the conspiracy was for the defendant and the co-conspirators to conceal the movement of the co-conspirators' property and assets through the United States from the United States Government and others.

18. A further purpose of the conspiracy was for the defendant and the co-conspirators to circumvent United States sanctions by manipulating material information concerning entities sanctioned by the United States, such as the true originator or beneficiary of financial transactions, in order to facilitate illegal United States dollar transactions.

## MANNER AND MEANS

19. It was part of the conspiracy that the defendant discussed with co-conspirators how to format United States dollar message payments so that such payments would avoid detection by automated filters used by unaffiliated financial institutions in the United States and thus evade United States sanctions and attempts to block such funds.

20. It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States.

21. It was part of the conspiracy that the defendant altered the names and references to co-conspirators in United States Dollar message payments routed through the United States.

22. It was part of the conspiracy that the defendant replaced the names of the co-conspirators with the name of the defendant's branch in United States Dollar message payments routed through the United States.

23. It was part of the conspiracy that the defendant created special processing methods to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States.

24. It was part of the conspiracy that the defendant replaced the names of the co-conspirators with defendant's name in United States Dollar letters of credit transactions.

25. It was part of the conspiracy that the defendant provided specialized service to Specially Designated Nationals by routing payments through related front companies to ensure that payments in violation of the CACRs were cleared through U.S. financial institutions.

26. It was part of the conspiracy that the defendant created a fake endorsement stamp for use by co-conspirators in a sanctioned country to process United States Dollar travellers' checks.

27. It was part of the conspiracy that the defendant caused unaffiliated U.S. financial institutions to submit materially false and misleading reports or statements to the United States Department of Treasury, OFAC.

## OVERT ACTS

28. In furtherance of the conspiracy and to achieve the objects and purposes thereof, the defendant and co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

(a) In 1994, ING Bank established Netherlands Caribbean Bank ("NCB"), a joint venture between ING Bank and Acemex, a shipping company owned by the Cuban government. From the early 1990s until 2006, ING Bank processed U.S. dollar payments for Cuban customers of NCB, ING Havana, and a third Cuban bank without reference to the payments' Cuban origin, so that the transactions appeared to the unaffiliated correspondent U.S. financial institution to originate from either ING Bank's branch in Curaçao or NCB.

(b) Employees at ING Bank's branch in Curaçao used the branch's own OFAC filter, which is a compliance program designed to identify transactions with sanctioned parties, to detect Cuban references, and then remove them from outgoing payment messages sent to the unaffiliated correspondent U.S. financial institution.

(c) ING Bank advised its sanctioned clients on ways to evade other banks' OFAC filters when receiving incoming payments at ING Bank's branch in Curaçao. Some Cuban clients instructed their debtors to make U.S. dollar payments to corporate aliases.

(d) ING Bank's branch in France circulated an internal memorandum entitled, "Procedure for payments in U.S.D to Cuba." The memorandum instructed ING Bank employees that "[u]nder no circumstances should the covering message addressed to our correspondent bank in the United States contain the name and [Society for Worldwide Interbank Financial Telecommunications] code of a Cuban bank, but only the SWIFT code of the bank to which we have addressed the payment."

(e) Between 2000 and 2006, ING Bank's branch in France provided a fake endorsement stamp to two Cuban bank customers for their use in processing U.S. dollar travellers' checks. The stamp was in French; it bore the signature of the payments department manager at ING Bank's branch in France and the initials of the Cuban bank, but made no other reference to Cuba. As a consequence, it appeared to unaffiliated U.S. financial institutions that ING Bank's branch in France, rather than a Cuban bank, had negotiated the travellers' checks.

(f) Between the early 1990s and 2006, ING Bank's Trade and Commodity Finance department in Rotterdam provided trade finance to two entities which had been identified as Cuban entities on OFAC's list of Specially Designated Nationals ("SDNs") since 1989. ING Bank employees in Rotterdam provided these sanctioned entities with U.S. dollar trade financing through the use of shell companies and its own internal ING Bank account to conceal from unaffiliated correspondent U.S. financial institutions that the transactions were on behalf of SDNs.

(g) ING Bank held U.S.-dollar accounts and confirmed letters of credit for a number of Iranian oil and financial concerns at ING Bank branches in the Netherlands and Belgium. These Iranian customers, which were owned in part by the Government of Iran, instructed ING Bank to remove any Iranian names in payment messages sent to unaffiliated correspondent U.S. financial institutions.

(h) Although payments may have complied with exceptions in the ITRs then in effect, ING Bank employees removed all references of Iran in payment messages sent to the United States to ensure that unaffiliated correspondent U.S. financial institutions could not identify the Iranian origin of the transactions, without making any determination as to whether the underlying transactions were legal or illegal.

(i) ING Bank employees in the Netherlands facilitated and processed payments in United States dollars on behalf of one of its customers, an aviation parts supplier located in the Netherlands, for the export of aircraft equipment from the United States, though the Netherlands, to Iran. ING Bank employees in the Netherlands processed approximately seventeen letters of credit issued by Iranian financial institutions for the customer involving U.S.-origin goods transhipped to Iran. ING Bank's branch in the Netherlands processed U.S.-dollar payments in connection with the trade transactions by omitting all Iranian references in messages sent to the unaffiliated correspondent U.S. financial institution.

(j) ING Bank's branch in Romania processed a letter of credit issued by an Iranian financial institution for the purchase of a U.S.-origin aircraft engine by an Iranian company, through a trading company in Romania. ING Bank's branch in Romania processed U.S.-dollar payments in connection with the trade transaction by omitting all Iranian references in messages sent to the unaffiliated correspondent U.S. financial institution.

All in violation of Title 18, United States Code, Section 371.

6/11/2012
DATE

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

_____
Ann H. Petalas
George P. Varghese
Assistant United States Attorneys
National Security Section

6/11/2012
DATE

LISA O. MONACO
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

_____
Jonathan C. Poling
Trial Attorney
National Security Division

6/11/2012
DATE

LANNY A. BREUER
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

_____
Matthew Klecka
Trial Attorney
Asset Forfeiture and Money Laundering Section