## EXHIBIT A -- FACTUAL STATEMENT

### Introduction

1.     This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated June 11, 2012, between the National Security Division and the Criminal Division of the United States Department of Justice, and the United States Attorney's Office for the District of Columbia (collectively, "DOJ") and ING Bank, N.V. ("ING Bank"), a Dutch bank, and between the New York County District Attorney's Office ("DANY") and ING Bank.

2.     Starting in the early 1990s and continuing until 2007, ING Bank violated U.S. and New York State laws by moving billions of dollars illegally through the U.S. financial system on behalf of entities subject to U.S. economic sanctions.  ING Bank knowingly and willfully engaged in this criminal conduct, which caused unaffiliated U.S. financial institutions to process transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") relating to transactions involving sanctioned countries and parties.

3.     ING   Bank committed this criminal conduct by, among other things, (i) processing payments for ING Bank's Cuban banking operations through its branch in Curaçao on behalf of Cuban customers without reference to the payments' origin; (ii) providing U.S. dollar trade finance services to sanctioned entities through misleading payment messages, shell companies and the misuse of an internal ING Bank suspense account; (iii) eliminating payment data that would have revealed the involvement of sanctioned countries and entities, including Cuba and Iran; (iv) advising sanctioned

clients on how to conceal their involvement in U.S. dollar transactions; (v) fabricating ING Bank endorsement stamps for two Cuban banks to fraudulently process U.S. dollar travelers' checks; and (vi) threatening to punish certain employees if they failed to take specified steps to remove references to sanctioned entities in payment messages.  ING Bank's actions, which occurred outside the United States and largely within the ING Wholesale Banking division, caused unaffiliated financial institutions located in the United States to provide banking services to sanctioned entities, evaded detection by U.S. regulatory and law enforcement authorities, and caused unaffiliated U.S. financial institutions to falsify business records located in New York, New York.

4.      This conduct occurred in various business units within ING Bank's Wholesale Banking division, in locations around the world with the knowledge, approval and encouragement of senior corporate managers and the Legal and Compliance departments of ING Groep, N.V. ("ING Groep").

5.      Over the years, several ING Bank employees raised concerns to corporate management about the bank's sanctions violations.  However, no action was taken.

### ING Bank's Business Organization and Assets

6.      ING Bank is one of the largest banks in the Netherlands.  In 2011, it had approximately $1.2 trillion in assets.  ING Groep was established in 1991 through the merger of Nationale-Nederlanden, the largest insurer in the Netherlands, and NMB Postbank Groep, one of the largest banks in the Netherlands, and is the parent entity to ING Bank.

7.      Headquartered in Amsterdam, ING Bank offers a variety of banking products and services, including retail and commercial banking, wholesale banking, and trade and

commodity finance. Today, the bank has over 70,000 employees throughout Europe, the United Kingdom, the Americas and Asia.

8.      ING Bank has a representative office in New York ("ING New York"), which is supervised and regulated by the Federal Reserve System and the New York State Department of Financial Services.

## Applicable Law

*Cuban Sanctions*

9.      Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations. These laws, which prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses and Cuban assets, were promulgated under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. app. §§ 1-44, and are generally administered by the Office of Foreign Assets Control ("OFAC"), located in the District of Columbia.

10.     Unless authorized by OFAC, the Cuban Assets Control Regulations ("CACRs") prohibit persons subject to the jurisdiction of the United States from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, including all "transfers of credit and all payments" and "transactions in foreign exchange." 31 C.F.R. § 515.201(a). Furthermore, unless authorized by OFAC, persons subject to the jurisdiction of the United States are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the

United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b).  The CACRs also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations.  31 C.F.R. § 515.201(c).

*Iranian Sanctions*

11.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.  Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

12.     In Executive Order 12957, issued on March 15, 1995, the President found that "the actions and policies of the Government of Iran constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and ... declare[d] a national emergency to deal with that threat."

13.     On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran.  These sanctions prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or by a United States person, wherever located.  This prohibition includes the

exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or reexportation , directly or indirectly, to Iran or the Government of Iran.  On August 19, 1997, the President issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

14.     With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts.  The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs.

### DOJ Charge

15.     DOJ has alleged, and ING Bank accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, by conspiring to violate:

   a.   TWEA, Title 50, United States Code, Appendix Sections 1-44, and regulations promulgated thereunder, principally 31 C.F.R. § 515.201, which prohibits U.S. persons from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, and 31. C.F.R. § 515.201(c), which

prohibits attempts to evade or avoid the restrictions contained in the CACRs; and

b. IEEPA, specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the ITRs, principally 31 C.F.R. § 560.204, which prohibits the exportation of services from the United States to Iran, and 31 C.F.R. § 560.203, which prohibits attempts to evade or avoid the restrictions contained in the ITRs.

### DANY Charge

16.     DANY has alleged, and ING Bank accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . (i) make or cause a false entry in the business records of an enterprise (defined as any company or corporation) . . . or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission of a crime."

### ING Bank's Conduct in Curaçao and Cuba

17.     ING Bank was the first foreign bank to establish an office in Cuba since the 1959 revolution. In 1994, the Cuban government issued a license for ING Bank to participate in Netherlands Caribbean Bank ("NCB"), a joint venture between ING Bank and Acemex, a shipping company owned by the Cuban government. Based on ING Bank's

participation in NCB, the Cuban government also permitted ING Bank to open its own representative office on the island in 1994 ("ING Havana").

18.    NCB held U.S. dollar bank accounts, and issued U.S. dollar loans and letters of credit for commercial clients. NCB's ability to transact in U.S. dollars was one of its key competitive advantages over other Cuban banks.

19.    ING Havana provided trade and commodity finance to Cuban ministries and international clients.

20.    ING Curaçao was a branch office of ING Bank. From the early 1990s until 2006, ING Curaçao processed U.S. dollar payments for NCB, ING Havana and a third Cuban bank without reference to the payments' Cuban origin.    ING Curaçao personnel completed the payment messages so that the transactions appeared to the unaffiliated correspondent U.S. financial institution to originate from either ING Curaçao or NCB. Every one of those transactions was prohibited by U.S. economic sanctions. To commit this criminal conduct, ING Bank undertook several measures to conceal the involvement of Cuban parties from an unaffiliated U.S. correspondent bank in New York.

21.    ING Bank  managers ordered employees in the Payments department to omit the words "Cuba" or "Havana" from SWIFT payment messages for Cuban parties.[1]  In that regard, in 1997, an ING Curaçao executive distributed the following email:

> dear all . . . Very often we are mentioning Cuba or Havana in payment instructions, related to our U.S.$ account in [our U.S. correspondent bank]. This create [sic] continuously problems with our correspondent banks in the U.S.A. I strongly request you in payment instructions to our

---

[1]    ING is a member of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") and has historically used the SWIFT system to transmit international payment messages with other financial institutions around the world, including its U.S. correspondent banks.

U.S.A correspondents etc NOT!!!! to use the word Cuba or Havana. If you do not know , how to fill in the documents, please approach your department head.

22.    Management made clear that any employee who revealed the involvement of Cuban parties in a payment message would be subject to reprimand and possible termination.    For instance, in 2001, a senior manager in the Human Resources Department of ING Curaçao distributed this email "[o]n behalf of the Management":

Dear colleagues,

A couple of days ago an incorrect transaction resulted in a loss of 180,000 Usd for the Bank.  Due to the U.S. embargo against Cuba, all transactions through the United States to Cuban beneficiaries are being confiscated.

Although everybody within our processing department is aware of this, we still want to ratify to everyone that all Cuban transactions should be checked thoroughly.  It is unacceptable to suffer these kinds of unnecessary losses.  If by any means, these kinds of mistakes repeats itself in the future it will have severe consequences for the concerning parties.

23.    Another senior executive at the branch responded as follows:  "Personally, I'm more concerned that due to such errors the names of NCB and ING Curaçao might be linked to Cuba transactions.  This will be more severe compared to interest loss on blocked accounts."

24.    Bank employees complied with management's demands, and thereby deceived unaffiliated U.S. correspondent banks.

25.    As a general matter, all U.S. dollar payment messages sent on behalf of NCB and ING Havana to unaffiliated U.S. correspondent banks indicated that the originating bank was either ING Curaçao or NCB.  "NEDCAR," "Netherlands Caribbean Bank" or "ING

Curaçao" was substituted in payment messages for the originating Cuban customer's name.

26.     ING Curaçao's back-office software system was manually coded to omit the addresses of NCB and ING Havana customers from outgoing SWIFT messages.

27.     Instead of using serial MT 103 payment messages for Cuban transactions, which would have revealed the identity of the ordering customer and beneficiary, ING Curaçao used MT 202 "cover payment" messages, which did not.[2]

28.     ING Curaçao also used its own OFAC filter as another way to identify and strip Cuban references from outgoing payment messages.[3]   ING Curaçao thus used a compliance tool to circumvent U.S. sanctions.

29.     On at least two occasions, payments were blocked when complete originator information was mistakenly included in outgoing SWIFT messages.  Both times, ING Curaçao knowingly made intentional misrepresentations to an unaffiliated U.S. correspondent bank in New York in an effort to recover the lost funds by asserting that the payments were supposed to be denominated in a currency other than U.S. dollars.  In both instances, those efforts failed, but in these instances ING Curaçao acted on instructions and with knowledge of ING Groep Compliance and Legal departments.  One senior member of ING Groep's Compliance department said he saw "no problem" with

---

[2]     An MT 103 message is the de facto standard for cross-border customer credit transfers, whereas the MT 202 message is the de facto standard for bank-to-bank credit transfers.  Typically, a cover payment is executed through a combination of the two types of SWIFT messages: an MT 103 is sent from the actual originator to the ultimate beneficiary, but the funds are actually transferred through the United States via an MT 202, which lacks that detail.  Consequently, the U.S. financial institution would not be in a position to detect whether the payment is made to or from a sanctioned country or entity.

[3]     An OFAC filter is software designed, in part, to identify transactions involving sanctioned parties.

lying to ING's unaffiliated correspondent bank, while an attorney in ING Groep's Legal department described the deception as a "little white lie."

30.     ING Bank also advised its sanctioned clients on ways to evade other banks' OFAC filters when receiving incoming payments at ING Curaçao.  Some Cuban clients instructed their debtors to make U.S. dollar payments to corporate aliases.   Others eliminated their names from incoming payment messages; for those clients, NCB would send a facsimile to ING Curaçao with crediting instructions.

31.     ING Bank managers instructed ING Curaçao not to share information about the bank's Cuban operations with ING Bank employees in the United States, lest ING Curaçao be deemed a "person subject to the jurisdiction of the United States" for purposes of the CACRs.  31 C.F.R. § 515.329.  But instead of adhering to that policy, many ING Curaçao managers and staff simply referred to the Cuban business as "Other Caribbean" in reports to ING New York.

32.     ING Bank managers failed to take action when warnings were given about the ramifications of its Cuban U.S. dollar business.

      a. In 1995, ING Bank considered expanding its Cuban operations.  The bank's outside attorney warned "that U.S. dollars should not be used for the purpose of making an investment in Cuba or as a transaction currency in implementing the Proposed Services."

      b. In 2003, the Legal Department at ING New York questioned whether the Curaçao branch was violating U.S. economic sanctions.  After a discussion with relevant personnel in Curaçao, the bank's Corporate Special Investigations staff found that using cover payments prevented them from

being "blocked" in the United States, and that the procedure "complies . . . completely with the FATF requirement and can simply be done via SWIFT." The employee concluded "[i]n and of itself this is not an offense", but used the term "handighei" to describe the procedure, which roughly translates to "tricky business." When that finding was relayed to  a top official of ING Groep Compliance he responded, in relevant part:

> While I myself was in Curaçao for three years, the problem was solved in the following manner. The specification was coded and anyone who used the word "Cuba," "Havana" or something similar in specifications was fired summarily. . . . Given the American laws, this discussion is absolutely useless because [the U.S. correspondent bank] has to comply with the OFAC list. Therefore, pay in Euros or code and thus in fact provide incorrect info to [the U.S. correspondent bank]. In the nineties we did not make a fuss about this, but now things are different.

c. In 2004, the Director of the Compliance department at ING New York issued a memorandum on OFAC compliance for distribution throughout the Americas region. The memorandum stated:

> ING has mandated that all OFAC requirements will apply to ING Wholesale staff operating in the Americas. As a result Americas based staff must not solicit or conduct business with countries, entities and individuals on the "OFAC list." This particularly applies to Cuba, which is on the OFAC list.

The memorandum was sent to the Compliance Officer at ING Curaçao, but was not distributed it to any employees.

33.     Between 2001 and 2006, ING Curaçao processed over $2 billion in transactions involving sanctioned countries and entities.

### ING Bank's Conduct in the Netherlands – TCF Rotterdam

34.     ING  Bank's Trade and Commodity Finance department in Rotterdam ("TCF Rotterdam") provides trade finance to a variety of industries.  For many years, one of its most important clients was the Fondel Group, a Rotterdam-based commodities concern with close ties to Cuba.  Two Fondel Group companies, Niref and Curef,[4] are majority-owned by the Cuban government.  Both companies have been identified as blocked Cuban entities on OFAC's list of Specially Designated Nationals since 1989.  U.S. sanctions prohibit U.S. persons – including U.S. financial institutions – from conducting any transactions with Niref or Curef.  TCF Rotterdam nonetheless provided these entities with U.S. dollar trade financing, and helped them conduct numerous transactions through the U.S. financial system.   TCF Rotterdam thus caused unaffiliated U.S. financial institutions to unwittingly do prohibited business with Specially Designated Nationals.

35.     In 1993, a financial institution in New York blocked a $1 million payment from Niref's account at TCF Rotterdam to a Russian counterparty. Working together, ING and the Fondel Group tried unsuccessfully to recover the funds. TCF Rotterdam managers falsely told the unaffiliated New York financial institution and OFAC that Niref was 100% Dutch-owned.

36.     Greendown  Holland  B.V. ("Greendown  Holland"), another Fondel  Group company, maintained a U.S. dollar account at  TCF Rotterdam.  Between 1992 and 2004,

---

[4]     Niref is the exclusive sales agent for Cubaniquel, a Cuban-owned nickel company.  Curef trades in Cuban scrap metal.

the Cuban government indirectly owned 51% of Greendown Holland; but unlike Niref, Greendown Holland was not on OFAC's list of Specially Designated Nationals.

37.    In the midst of TCF Rotterdam's efforts to recover Niref's blocked funds, the Head of the TCF department instructed his subordinates to substitute the name "Greendown Holland" for Niref in connection with the bank's U.S. dollar transactions for the sanctioned entity.  Thereafter, Niref issued invoices and received and made U.S. dollar payments using the "Greendown Holland" name to avoid the risk that Niref's U.S. dollar payments would be blocked or confiscated in the United States.  TCF Rotterdam employees routed incoming U.S. dollar payments into Niref's U.S. dollar account even though Greendown Holland was listed as the beneficiary in the payment messages. Internal ING Bank documents openly reflected this practice, noting, for example: "Niref is a so-called black-listed company in the U.S.A whereby U.S. Dollar [sic] coverages through U.S.A banks can be attached.  In order to avoid this some sales are routed through Greendown (not to be disclosed outside the Bank)."

38.    About three years later, TCF Rotterdam instituted a similar practice on behalf of Curef using another Fondel Group company known as "Triumph," which appeared to have no Cuban ownership.  TCF Rotterdam opened a U.S. dollar account for Triumph, the sole purpose of which was to receive and send U.S. dollars through unaffiliated financial institutions in New York on behalf of Curef.  The Head of the TCF department explained that "Triumph acts as a special purpose front office for Curef for certain transactions. (Highly confidential)."

39.    Following standing instructions, TCF Rotterdam's back office employees would transfer U.S. dollars between the U.S. dollar accounts of Triumph and Curef.

40.     In addition to allowing the Fondel Group to use shell companies to conceal transactions with Specially Designated Nationals, TCF Rotterdam used its own internal suspense account to process U.S. dollar payments on behalf of at least three sanctioned Fondel Group entities.  TCF Rotterdam did so to prevent the payments from being rejected or blocked by U.S. financial institutions.  The outgoing SWIFT messages for such payments falsely identified ING Bank, instead of the relevant Fondel Group company, as the originator to unaffiliated U.S. financial institutions.

41.     For over a decade, TCF Rotterdam thus knowingly and willfully facilitated the Fondel Group's use of shell companies and its own infrastructure to allow the Fondel Group and its affiliates, some of which were Specially Designated Nationals, to engage in U.S. dollar transactions without being detected by unaffiliated U.S. financial institutions or law enforcement authorities.  The practices were frequently and openly described in the Fondel Group's credit applications, which were submitted to senior executives and Risk Management at TCF Rotterdam.  On two occasions, in 1997 and 2003, Risk Management raised concerns about the risks inherent in the use of shell companies to circumvent U.S. economic sanctions.  Their warnings were ignored.

42.     Between 2003 and 2006, TCF Rotterdam processed approximately $118 million U.S. dollar transactions on behalf of Niref, Curef, Greendown Holland and Triumph.

**ING Bank's Conduct in the Netherlands (Amsterdam Office) and Belgium**

43.     As it did elsewhere, ING's offices in the Netherlands and Belgium provided various services to sanctioned entities and customers that did business with sanctioned entities, including U.S. dollar payment processing, documentary trade services and structured finance services.  For example, ING processed payments on behalf of one

customer, Aviation Services International ("ASI"), through the United States for trade services relating to the procurement by ASI of U.S. origin aircraft parts for ASI's Iranian clients.

44.     ING Bank's office in Belgium ("ING Belgium") held a USD correspondent account for the Central Bank of Iran, also known as Bank Markazi, which was used to receive proceeds of oil purchases by ING customers from the National Iranian Oil Company ("NIOC"). NIOC is part of the Government of Iran. ING Bank's office in the Netherlands ("ING Netherlands") confirmed letters of credit in favor of NIOC in connection with those transactions.     These transactions were processed by ING Netherlands using cover payments, in accordance with NIOC's instruction that no Iranian names be mentioned to U.S financial institutions, which could lead to the delay, blockage, or rejection of the payments—a practice which differed from the automated processing of payments for non-sanctioned entities.

45.     Until 2008, the U.S. government had an exemption allowing certain transactions termed as "U-Turn" transactions. Although payments may have complied with the U-Turn provision then in effect, ING Bank employees used cover payments without making any determination as to whether the underlying transactions were legal or illegal. ING employees believed that unaffiliated U.S. banks would not process any Iran-related transactions, legal or illegal, from ING Bank. Employees further believed that the only way for ING Bank to get Iranian transactions through unaffiliated U.S. banks was to ensure that the U.S. banks' filters could not identify the Iranian origin of the transactions. The U.S. banks would then process the Iranian transactions without knowing where the money was destined.

46.     These included at least $6 million in transactions for Iranian concerns that were rejected by U.S. financial institutions, but then resubmitted by ING without any Iranian references. The transactions also included at least $76 million in transactions for Iranian concerns that terminated in the United States, in violation of IEEPA.

47.     When, in 2003, ING Bank opened the U.S. dollar account for Bank Markazi, it had initially planned to open the account at ING Netherlands, but employees there were unwilling to manually process payments, which they thought might be necessary to comply with Bank Markazi's request that its name not be included in payment messages sent to the U.S. ING Netherlands employees did not want to assume the risk of making errors during manual routing that they believed could cause U.S. correspondent banks to confiscate dollars from the Central Bank of Iran. Employees at ING Belgium, by contrast, were willing to assume the risk. Moreover, ING management in both Belgium and the Netherlands concluded that its other Iranian business was too lucrative to forego the Bank Markazi account.

48.     ING Belgium employees used cover MT 202 SWIFT messages to execute payments. The effect of using MT 202 cover payment messages was to remove the identity of the ordering customer and beneficiary. This practice—dubbed the "Dual MT 202 method"—was described in various internal documents, which noted that care should be taken by ING employees to remove any reference to Iran from payment data.

49.     Because of the Central Bank of Iran's U.S. dollar account at ING Belgium, ING Netherlands' Documentary Trade Department was able to service the letters of credit for NIOC, with the payments routed to ING Belgium through unaffiliated U.S. correspondent banks. Employees at ING Netherlands and ING Belgium understood that this inter-

branch practice was created "since NIOC/Bank Markazi are special clients that require special procedure." As one employee stated, "the motivation is to avoid mentioning any iranian [sic] names in New York, for reasons we all know."

50.     Beginning in 2001, ING Netherlands established a syndicated loan facility for National Petrochemical Company ("NPC"), an Iranian oil concern. NPC is part of the Government of Iran. Proceeds from the company's oil sales were deposited into an escrow account at ING Netherlands, from which the company could withdraw surplus funds. Pursuant to the company's instructions, on several occasions, ING Netherlands employees in the Structured Finance Department executed U.S. dollar payments from the escrow account through U.S. financial institutions without reference to Iranian names.

51.     Despite all of these efforts, some transactions for sanctioned entities were blocked, rejected or cancelled by ING's unaffiliated U.S. correspondent bank. On numerous occasions, ING employees in the Netherlands and Belgium resubmitted those payments, either amending a SWIFT field or changing the payment method from serial to cover to conceal references to sanctioned parties.

52.     In 2003, an employee from ING Bank's office in the United Kingdom ("ING London") sent a Compliance representative the bank's "Modus Operandi" for U.S. dollar payments in connection with letters of credit issued in favor of NIOC: a cover payment to another bank in New York for the company's account at the other bank's London branch, without any reference to Iranian names. The ING London employee asked whether ING Bank could continue to conduct these transactions in the "climate of anti-money-laundering and OFAC sanctions." The Compliance employee told him that he could continue.

53.     The issue of U.S. economic sanctions was raised again in May 2004, when Wholesale Banking Compliance at ING London circulated an email to employees in several European offices explaining that certain countries, including Cuba and Iran, were subject to U.S. economic sanctions and that ING should not carry out U.S. dollar transactions from or to entities in those countries.  A senior member of ING Groep's Legal Department responded by email:

> You are absolutely right in warning the business for the fines the OFAC can hand out.  But on the other hand we have been dealing with Cuba (and ways around clearing through Manhattan) for a lot of years now and I'm pretty sure that we know what we are doing in avoiding any fines.  So don't worry and direct any future concerns to me so that we can discuss before stirring up the whole business.

When asked, the author of this email said that the Compliance officer's email came at a time when Compliance was "killing the business away."

### ING Bank's Conduct in France

54.     As in Curaçao, ING France processed U.S. dollar payments on behalf of Cuban entities.  In 2002, a $3 million payment on behalf of a Cuban bank was blocked by another financial institution.  Senior managers from ING France and headquarters in Amsterdam tried unsuccessfully to recover the funds.  Meanwhile, they debated whether ING Bank or the Cuban bank should be liable for the loss.  After personally meeting with senior representatives of the Cuban bank and the Cuban Central Bank, a senior internal lawyer at ING Groep in Amsterdam concluded that ING France was liable because it had contravened its prior practice of not mentioning "the name of the ultimate beneficiary" in SWIFT payment messages for the Cuban bank.  In other words, ING France would bear

the loss because it had failed to adhere to a general policy of deceiving other unaffiliated financial institutions in order to evade U.S. economic sanctions.

55.     Soon thereafter, that general policy was memorialized in a document titled "Procedure for payments in U.S.D to Cuba." It stated:

> OBJECTIVES OF THE PROCEDURE
>
> Reminder: The United States has imposed an embargo over, amongst other things, all movements of funds in favour of Cuban residents and Cuban banks.
>
> We have accounts on our books with Cuban banks, who entrust us with payments transactions from their account in U.S.D.  In order to avoid these payment funds from being frozen by the United States, you must follow the following procedure.
>
> Procedure
>
> We have opened a U.S.D account no 06915020001 on the books of [another financial institution] for U.S.D payments concerning Cuban banks, but payments should only be made to this bank where the ultimate Cuban beneficiary of the payments also has an account with [the other financial institution].
>
> For all other payments, a SWIFT MT103 must be sent to the bank (other than in the United States) which holds the beneficiary's account on its books, specifying in field 59 of the message the beneficiary bank or the beneficiary (name or SWIFT code) and indicating in field 54 the SWIFT code of the bank in the United States at which we are covering it.
>
> Under no circumstances should the covering message addressed to our correspondent bank in the United States contain the name and SWIFT code of a Cuban bank, but only the SWIFT code of the bank to which we have addressed the payment.

56.     This memorandum was widely circulated at ING France to high-level executives. ING France's Compliance Department reviewed it but made no objections. It was later posted to ING France's intranet site, where it was visible to all branch employees until ING Bank launched its internal investigation in 2006.

57.     In addition to processing payments for sanctioned entities, between 2000 and 2006, ING France provided a U.S. dollar travelers' check cashing service to two Cuban banks.  The practice began in 2000 at the request of a Cuban bank that forwarded U.S. dollar travelers' checks to ING France, which in turn endorsed the checks and sent them to the United States for payment.  Later that same year, ING France gave the Cuban bank permission to fraudulently use an ING France endorsement stamp.  The stamp was in French; it bore the signature of an ING France payments department manager and the initials of the Cuban bank, but made no other reference to Cuba.  As a consequence, to the unaffiliated U.S. financial institution that ultimately made payments on the travelers' checks, it appeared that ING France, rather than a Cuban bank, had originally negotiated them.  In other words, the endorsement stamp was specifically crafted to permit the Cuban bank to hide its involvement in the transactions.

58.     After stamping the travelers checks with ING France's endorsement, the Cuban bank would mail the checks for deposit into its U.S. dollar account at ING France.  ING France employees in the Payments Department would sort through the checks to ensure that each bore the fake ING Bank endorsement stamp.  Any stamped with the Cuban bank's actual endorsement were returned to Cuba.  ING France expanded this service to a second Cuban bank in July 2004.  A second ING France endorsement stamp was  created and sent to the second Cuban bank.

59.     Senior managers at ING France approved both the use of the fake endorsement stamp and the check-processing service.  The practice was also approved by the ING France Compliance Department, which wrote "I confirm I don't see this as a Compliance problem."

60.     Although the check processing service itself was not particularly profitable, it was beneficial to ING Bank's bottom line: according to a former manager of Trade Finance Department at ING France, it helped promote other lines of business with Cuban financial clients, including letters of credit.

61.     The risks this practice posed were raised in various audits of ING France; management, however, ING France's management disregarded those warnings.

62.     Between 2001 and 2006, ING France processed $62 million in transactions involving sanctioned countries and entities.

### ING Bank's Conduct in Romania

63.     ING Bank processed a $1,550,000 export letter of credit issued by Bank Tejarat, an Iranian Bank, to finance Iran Air's purchase of a U.S.-origin aircraft engine from a Romanian trading company.

64.     In collaboration with Bank Tejarat, ING Romania removed all references to Iran and the origin of the engine from the relevant sections of the letter of credit and related documentation.   When ING Romania transferred the confirmed letter of credit to the unaffiliated U.S. financial institution, the accompanying SWIFT message omitted reference to Bank Tejarat in the field where the issuing bank would ordinarily appear.

### Total Scope of ING Bank's Conduct

65.     As set forth above, for over a decade ING Bank executed transactions on behalf of Cuban and Iranian parties that were designed to evade detection by unaffiliated U.S. financial institutions.   Moreover, ING Bank provided specialized services to Specially Designated Nationals to ensure that payments in violation of the CACRs were cleared

through U.S. financial institutions. The total value of these transactions exceeded $2 billion.

### ING Bank's Internal Investigations

66. In July 2005, a senior officer of ING New York raised concerns regarding ING Bank's historical compliance with U.S. sanctions with the central bank of the Netherlands, De Nederlandsche Bank, N.V. ("DNB").

67. In response to that communication, the DNB submitted a series of inquiries to ING regarding ING Bank's payment processing for sanctioned countries and entities.

68. In March 2006, in consultation with the DNB, ING Bank initiated two internal investigations in response to the DNB inquiries. One investigation focused on ING Bank's Cuban operations; the other examined ING Bank's operations around the rest of the world. ING Bank reviewed millions of documents and conducted 775 interviews in over 18 jurisdictions in connection with these internal investigations. Also, ING Bank instructed business units in ING Bank to stop processing outgoing U.S. dollar payments for Cuban customers. This instruction was later extended to prohibit U.S. dollar payments for customers from other sanctioned countries, and to include other banking services in addition to U.S. dollar processing.

69. In response to a referral from OFAC, which was conducting its own investigation into ING Bank's apparent sanctions violations, and as part of other ongoing DOJ investigations regarding potential sanctions violations, DOJ initiated a criminal investigation into possible sanctions violations by ING Bank and its customers for potential violations of U.S. sanctions and potential involvement in the illegal exportation

of goods to sanctioned countries in U.S. dollars. The DOJ investigation covered ING Bank's U.S. dollar payment processing for sanctioned countries and entities.

70.     Initially, ING Bank was not fully forthcoming regarding the extent and scope of the sanctions violations. Subsequently, ING Bank produced the reports of its two internal investigations, which described ING Bank's sanctions violations. However, ING Bank initially produced the reports to the United States in heavily redacted form.

71.     DANY later opened its own investigation into ING Bank's possible violations of the New York State Penal Law. ING Bank also produced the internal reports to DANY, and DOJ and DANY subsequently conducted their investigations on a parallel basis.

72.     By 2010, ING Bank appointed a high-level executive to coordinate the bank's cooperation with the investigations by DOJ, DANY, and OFAC.

73.     As part of its cooperation with the U.S. authorities' investigations, ING Bank:

  a. Produced documents responsive to subpoenas in unredacted format;

  b. Provided memoranda of interviews of current and former bank employees that were conducted during and as part of ING Bank's internal investigations;

  c. Made current and former bank employees available for interviews;

  d. Enlisted forensic accountants to assist in a detailed review of all incoming and outgoing U.S. dollar business payments and trade transactions processed by ING Bank in 14 countries during the period from January 1, 2001 to March 3, 2009—which included the extraction of 133.9 million payment messages—for compliance with OFAC watch lists of all categories of Specially Designated Nationals, as well as OFAC sanctions programs relating to Burma, Cuba, Iran, Sudan, and North Korea as in force at the time of the payment;

e.  Provided regular and detailed updates to DOJ, DANY, and OFAC, on preliminary results of its review of U.S. dollar payments processing; and

f.  Gave presentations to DOJ and DANY on the ING Bank's disciplinary process, sanctions training, and other remediation efforts.

### ING Bank's Remediation Efforts

74.   ING Bank has taken the following voluntary steps to enhance and optimize its sanctions compliance programs:

a.  Beginning in 2004, ING Bank expanded its compliance program, ultimately almost doubling the number of employees in the compliance risk management function. The additional staffing has remained constant despite the fact that the size of the bank's business organization constricted due to economic conditions.

b.  In early 2007, as the results of ING Bank's internal investigations became available, ING Bank instituted disciplinary proceedings against more than sixty employees involved. Seventeen of those employees were disciplined for their conduct with a reprimand or sanction letter; three were forced to retire; and seven were terminated. Several employees under scrutiny left the bank before disciplinary decisions had been rendered.

c.  In 2007, ING Bank changed its governance structure and appointed a Chief Risk Officer ("CRO") to the Executive Board to be responsible for risk management, including compliance risk. The legal and compliance functions were separated, and a Chief Compliance Officer was appointed who reports directly to the CRO.

d.  ING Bank voluntarily terminated relationships with sanctioned banks and entities.

e.  ING Bank improved its sanctions training for managers, compliance personnel, and other staff.  This new training has been reinforced with ongoing compliance programs and training programs.

f.  ING Bank enhanced its U.S. dollar business payment filtering systems by replacing local business units' screening lists with centrally developed and globally applied mandatory screening lists.

g.  ING Bank created a new enhanced sanctions and financial economic crime policy, which includes a general prohibition of transactions on behalf of Specially Designated Nationals in all currencies.

h.  ING Bank has conducted over 160 internal audits with a significant focus on compliance risk management.